Kottmyer, J.
Plaintiff, Edmund Wojcicki, Individually and as Executor of the Estate of Sherry Wojcicki, brought this wrongful death action against Joan Caragher, M.D. The plaintiff alleged that Dr. Caragher was negligent in the care she rendered to Sherry Wojcicki on July 2, 1999, when Mrs. Wojcicki was brought to the emergency room of the Addison Gilbert Hospital after suffering a severe stroke. Trial commenced on November 17, 2003, and concluded with a jury verdict in favor of Dr. Caragher on November 26, 2003.
On December 9, 2003, plaintiff filed a motion for new trial on the grounds that Fred W. Hochberg, M.D., an expert who testified on behalf of the defendant, gave false and misleading testimony. On February 23, 2003, the Court allowed plaintiffs motion for a new trial and awarded reasonable costs, including attorneys fees, incurred by plaintiff in connection with the trial of the case. Thereafter, counsel for Dr. Hochberg filed an appearance and further proceedings were held at the request of Dr. Hochberg.
HISTORY OF RELEVANT PROCEEDINGS A. Plaintiffs Theory of the Case
The plaintiff s theory of the case, supported by the requisite expert testimony, was that Dr. Caragher departed from the standard of care applicable to physicians practicing the specialty of emergency medicine when she failed either to offer thrombolytic therapy (tissue plasminogen activator or t-PA) to Mrs. Wojcicki or promptly to transfer her to another hospital where she could receive such therapy. Mrs. Wojcicki had had *582 a recurrence of breast cancer in 1999, when she was diagnosed with an eight-centimeter mass in her breast. She received two courses of chemotherapy with the final dose administered on July 1, 1999, the day before she was brought to the emergency room. Mrs. Wojcicki had not undergone a gadolinium MRI (a contrast study of the brain), a Ct Scan of the brain or node sampling in connection with the recurrence.
B. The NINDS Study
At trial, plaintiff offered in evidence and relied heavily on an article entitled “Tissue Plasminogen Activator for Acute Ischemic Stroke,” published in the New England Journal of Medicine on December 14, 1995. The article reported the results of a study consisting of two trials conducted at various medical centers throughout the country by The National Institute of Neurological Disorders and Stroke t-PA Stroke Study Group (“The NINDS Study”). The publication of the results of the NINDS Study had a significant impact on the treatment of stroke patients in emergency rooms in that it was believed by many neurologists to show that administration of t-PA to victims of severe stroke within three hours of the onset of the stroke decreased the impairment caused by the stroke. At the same time, administration of t-PA carries a significant risk of death due to intracranial hemorrhage and it is therefore essential to screen patients carefully before administering t-PA.
Evidence developed during post-trial hearings established that physician-investigators screened candidates for inclusion in the NINDS Study trials using a list entitled “Exclusion Criteria,” that consisted of a series of statements. Patients to whom any one or more of the statements applied were excluded from the Trials. The Exclusion Criteria included the following statement: “Patient has a serious medical illness that is likely to interfere with this trial.” No statement in the Exclusion Criteria pertained specifically to cancer.
Those patients who were included in the Trials filled out a “Baseline Medical History Form,” some time after they had been included in the Study. That form posited the question: “Has any physician ever diagnosed the patient as having a malignancy?” Fifly-nine of the six hundred twenty-four patients included in the Study responded affirmatively to this question. The only information detailing the type of cancer and the temporal relationship between the diagnosis of a malignancy and inclusion in the Study is likely, but not necessarily, contained in the medical records for that patient kept by the participating medical center at which the patient received treatment. The publicly available data relating to the Study was contained on a CD-ROM that could be obtained from the National Technical Information Service. The CD-ROM contains data reflecting that fifty-nine of the participants in the Study had been diagnosed by a physician as having a malignancy, but no other detail as to the type of cancer, the date of diagnosis or the status of the cancer on the date the patient received treatment for stroke at the participating medical center. Thus, one cannot determine the type of cancer or whether it was active on the date of inclusion in the Study by reviewing the publicly available data, although one can determine by reading the CD-ROM that fifty-nine of the patients included in the Trials had at same point been diagnosed with cancer.
C. Trial Testimony of Dr. Hochberg
Dr. Fred Hochberg, a neuro-oncologist at Massachussets General Hospital (“MGH”), was called as an expert witness by the defendant. He testified that the consults with physicians concerning the treatment of patients “who present with acute ischemic stroke in the face of underlying cancer” and renders advice to physicians with regard to questions involving the use of thrombolytics in “ischemic stroke in the face of underlying cancer.”
The following testimony was elicited by David Gould, counsel for Dr. Caragher, on direct examination:
Q: Dr. Hochberg, are you familiar with the NINDS Study that was published in December of 1995?
A: Yes.
Q: And as part of this study, Dr. Hochberg, based on your review of it together with your knowledge, training, and experience, as a neurologist, were there any patients included in that study who presented with cancer?
A: No.
Q: Were there any patients who are [sic] part of that study who presented with breast cancer?
A: There were no patients with breast cancer in the NINDS, either part one or part two of that study.
(11/24/03 Tr. at 13)
On cross-examination, Dr. Hochberg responded as follows to questions asked by Marc Breakstone, counsel for plaintiff:
Q: Now, how many patients in the NINDS Study had a bad back?
A: No one knows. They never published it.
Q: How many patients in the NINDS Study had a hip replacement?
A: No one knows.
Q: How many patients in the NINDS Study has male pattern baldness?
A: It’s getting close to home, sir. None.
Q: . . . How many patients in the NINDS Study had arthritis?
A: No one knows.
Q: How many patients in the NINDS Study had cancer?
A: Zero.
Q: No one knows?
A: Excuse me, Zero.
*583 Q: You’re telling the ladies and gentlemen of this jury that this study indicates how many patients had cancer?
A: That’s correct
Q: Okay. Let’s . . .

A: It’s not published in there.

Q: . .. Well, let’s have a look at it, Doctor. Exhibit 12 is a copy of the NINDS Study. Would you tell us where in the study it states that none of the patients had cancer?

A: You’re referring to the study or the publication of the study?

Q: What is it that you’re holding in your hands, sir?
A: This is the publication of the study. You asked me about the actual NINDS Study and the answer is Zero. The publication of the study makes no mention of the cancer patients. The actual study contained no cancer patients.
(Id. at 47-48, emphasis added.)
On redirect, the following testimony was elicited by Mr. Gould:
Q: Dr. Hochberg, what is the difference between the publication of the study and the study results themselves?
A: With respect to the NINDS Study, Mr. Gould?
Q: Yes.
A: The NINDS Study was completed in approximately 1994. The current study data, which include the data of every patient who was entered into the study, those who were included, those who were not included, those who had hip disease, male pattern baldness, are all included in two large CD-ROMS that are available from the National Institutes of Health.[1]
To publish the results of the study in the New England Journal of Medicine requires that those data be distilled down to an article that can be read by physicians and non-physicians alike, that will give them the base information that is about the nature of the study. But the actual study details are not embedded in this article.
(Id. at 57-58, emphasis added.)
On redirect Dr. Hochberg was asked whether cancer was an Exclusion Criteria for t-PA. He answered:
No patient with cancer was included in the NINDS Study. (Emphasis added.)
The jurors were directed to disregard the answer because it was not responsive, the question was reiterated and the witness answered “no.” Id. at 58-59.
D. Post-Trial Proceedings
1.Plaintiffs Request for Data
The verdict was returned on November 26, 2003. On December 2, 2003, Mr. Breakstone wrote to Mr. Gould. He stated that at 5:00 p.m. on November 26th, the day the verdict was returned, he had called Mr. Gould and advised that Dr. Guy Rordorf, a neurologist and stroke specialist at MGH who had testified as an expert on behalf of the plaintiff, had stated that there was no published or unpublished data to support Dr. Hochberg’s testimony that cancer patients were not included in the NINDS Study trials. Breakstone asked Gould to provide the data relied on by Dr. Hochberg and, in particular, the CD-ROMs referred to by Dr. Hochberg in his testimony. On November 28, Mr. Gould orally responded that Dr. Hochberg stated that he was 100% certain that his testimony was accurate. Mr. Breakstone again requested the data via telephone on December 1, 2003, and in his December 2, 2003 letter.[2]
2.The Motion for a New Trial
On December 9, 2003, the plaintiff filed a Motion for a New Trial and for Sanctions. In the motion and supporting memorandum, the plaintiff contended that Dr. Hochberg had presented false and peijurious testimony and, in particular, had falsely testified that “Zero cancer patients participated” in the NINDS Study. In support of the motion, plaintiff submitted an affidavit of Dr. John R. Marler, the NIH Coordinator for the NINDS Study. In that affidavit, Dr. Marler stated that fifty-nine of the six hundred twenty-four patients who participated in the Study had responded affirmatively to a question on a Baseline Medical History Form that they “had been diagnosed by a physician as having malignancy” and that that information was in the publicly available data base for the Study. The plaintiff also provided an affidavit of Dr. Barbara C. Tilley, the lead Biostatistician for the Study, who confirmed that fifty-nine patients included in the Study had responded positively to a question relating to a diagnosis of malignancy.
A hearing was held on the motion for a new trial on January 8, 2004. After reviewing the motion and supporting information, the Court ordered that Dr. Hochberg appear for a deposition and testify as to the basis for his trial testimony. (1/8/04 Tr. at 32-34.)
3.The Deposition of Dr. Hochberg
On January 23, 2004, the plaintiff deposed Dr. Hochberg.[3] Dr. Hochberg strenuously defended his trial testimony repeatedly asserting that all references in his testimony to the eligibility of cancer patients for inclusion in the NINDS Study were specific to Mrs. Wojcicki, te., “a woman who has an acute uncontrolled cancer that’s eight centimeters, that has lymph node metastasis, who has a hematocrit that is falling, who is receiving chemotherapy.” (1/23/04 Tr. at 13.) He also described his testimony as referring only to an “acute, presenting with aggressive, chemotherapy-receiving patient.” See, e.g., id. at 27, 32-33, 37-38, 40-43, 52, 56, 60, 82-83, 99-100, and said that the “entire testimony” that he provided at trial was “that Mrs. Wojcicki had an active cancer, and the context is that the NINDS Study, to the best of my knowledge, had no active cancer patients included in it.” Id. at 13.
*584 The following exchange took place:
Q: What do you base that testimony on?
A: The testimony is based on a telephone call that I had with the biostatistician responsible for the NINDS Study.
Q: Who is that?
A: Dr. Tilley.
Q: When did you have that conversation?
A: Approximately two weeks before the trial.
(Id. at 23-24.)
Dr. Hochberg further testified as follows:
Q: Did you speak with Doctor Tilley herself?
A: Absolutely.
Q: Had you ever spoken to her before?
A: No.
Q. How did you identify yourself?
A: I, I said, My name is Dr. Hochberg. I’m neuro-oncologist at the Massachusetts General Hospital. I have a clinical question.
Q: What did you say?
A: I said, “There is an issue if a — I’m involved in a case of a woman with active breast cancer, who is receiving chemotherapy, has an eight centimeter lesion, and the nature and extent of the breast cancer is uncertain. The patient has presented with an acute stroke. Would that patient have been eligible or included in the t-PA NINDS trial?
Q: And what did she say?
A: No. To the best of her knowledge, no.
Q: Did you ask her why?
A: Did not.
(Id. at 21-22.)
According to Dr. Hochberg, the conversation then ended. In response to other questions, Dr. Hochberg testified that on the same day he had spoken with a secretaiy to Dr. Marler, who suggested he call Dr. Tilley, that he made the telephone calls from his office at MGH and that he had had a veiy short conversation with Dr. Tilley, “one question and one answer.” Counsel requested that Dr. Hochberg provide the relevant telephone records and he stated that he did not believe that they could be retrieved, but that he would produce them if they could be retrieved. Id. at 20-21.
Dr. Hochberg also testified that he did not have possession of and had not reviewed the Study data on the CD-ROM before he testified. See, e.g., id. at 77, 96. During the deposition, Dr. Hochberg repeatedly testified that the sole basis for his testimony that there were no patients in the NINDS Study who presented with cancer or breast cancer was that telephone call to Dr. Tilley “and nothing else.” See, e.g., id. at 13,23-24,34-35,42,50-51, 61-62, 63, 64, 100. When asked whether he knew before he spoke to Dr. Tilley that he would testify at trial that there were no cancer patients in the NINDS Study, he answered: “Absolutely not.” Id. at 62-63.
4. The MGH Telephone Records and Supplemental Tilley Affidavit
On February 6, 2004, Dr. Hochberg produced telephone records for the telephone in his office at MGH. They reflected a thirty-second call to Dr. Tilley’s office in Charleston, South Carolina, at 10:51 a.m. on November 17, 2003 (the first day of the trial), preceded by a six-minute telephone call to Dr. Marler’s office in Bethesda, MD at 10:45 a.m. Plaintiff filed a supplemental affidavit of Dr. Tilley dated February 11, 2004. In that affidavit, Dr. Tilley reiterated that she had never spoken with Dr. Hochberg. Further, she stated that on November 17, 2003, the day on which the MGH telephone records reflect the thirty-second call to her office in Charleston, South Carolina, she was in San Francisco attending a meeting of the American Public Health Association and was not in her office. Dr. Tilley also stated that there is no data in the NINDS Study Report, the NINDS Study data set on CD-ROM, or anywhere else that provides information whether any patient included in the Study had active aggressive, on-going, chemotherapy-receiving cancer, and that, if she were asked, she “would not make the statement that a patient with active aggressive, on-going, chemotherapy-receiving cancer would not have been included in the NINDS Study.”
5. The February 23 and April 1 Hearings
On February 23, 2004, a further hearing was held. Dr. Hochberg filed a second affidavit reiterating that he had spoken by telephone with Dr. Tilley and stating that the telephone record attached to that affidavit was the record of his telephone conversation with Dr. Tilley. At the hearing, the Court allowed the plaintiffs motion for a new trial and for costs, including attorneys fees. In so ruling, the Court found that Dr. Hochberg’s deposition testimony was not credible for the following reasons: a) contrary to the statements in his deposition, Dr. Hochberg had not qualified his trial testimony that no patient with cancer was included in the NINDS Study; b) Dr. Hochberg’s deposition testimony that he based his testimony that no cancer patients were included in the NINDS Study on a thirty-second telephone call to Dr. Tilley in which he introduced himself and asked a single question was implausible; c) Dr. Tilley was in California on the day on which Dr. Hochberg and the telephone records he produced indicated that he had made the thirty-second call to her office in Charleston, South Carolina; e) Dr. Tilley provided sworn statements that she had never spoken to Dr. Hochberg and would not have answered the question Dr. Hochberg testified he asked her; f) Dr. Tilley and Dr. Marler provided sworn statements that the only available data concerning the question whether patients with cancer were included in the Study was on the CD-ROM and reflected that fifty-nine of the patients included in the Study had responded *585 affirmatively to the question whether they had been diagnosed by a physician as having a malignancy; and g) Dr. Hochberg acknowledged that he had never reviewed the CD-ROM containing the data set for the Study. Finding that the testimony that was presented to the jury through Dr. Hochberg was not true and concerned an issue that was central to the case, the Court stated that it would allow the motion for a new trial and for costs.[4]
The Court indicated that it would afford Dr. Hochberg an opportunity to be heard before issuing a decision questioning his credibility and before determining what, if any, action the Court would take with respect to his trial and deposition testimony. (2/23/04 Tr. at 32.) On February 28, 2004, the Court received a letter from attorney William J. Dailey, Jr., entering an appearance as counsel for Dr. Hochberg and requesting an opportunity to be heard before the decision issued. A hearing was held on April 1, 2004. In connection with that hearing, Dr. Hochberg submitted a series of affidavits from neurologists, including physicians who served as Principal Investigators for the NINDS trials at medical centers that participated in the Study. At the request of counsel for Dr. Hochberg, Dr. Tilley had provided the identification numbers assigned to those patients enrolled in the Study who had indicated that they had been diagnosed with a malignancy. The physicians then used the identification numbers to retrieve from the participating hospitals the medical records of those patients. Based on their review of the original records, the physicians stated that “to the best of their knowledge,” no patient included in the Study had active cancer.[5]
Faced with Dr. Tilley’s Supplemental Affidavit in which she again denied that she had ever spoken to Dr. Hochberg and stated that she had been in California on the day Dr. Hochberg made the thirty-second telephone call to her office in South Carolina, Dr. Hochberg continued to maintain that his trial testimony and deposition testimony were true. The Court stated that it was inclined to credit Dr. Tilley’s affidavits based on all of the information before the Court, including the fact that Dr. Hochberg deliberately created the false impression that he had reviewed the actual Study data on the CD-ROMs and that, according to Dr. Hochberg, the basis of his testimony was a thirty-second telephone call to a person he had never met in which a single question was asked and answered with no follow-up. The Court also relied on Dr. Tilley’s lack of motive to deny having had a conversation with Dr. Hochberg, her statement that as a biostatistician she would not have answered such a question, but would have referred the caller to Dr. Marler or one of the clinical investigators, and the fact that all that could be determined from the publicly available data was that fifty-nine of the patients included in the study had at some point been diagnosed by a physician as having a malignancy.
Dr. Hochberg objected to the Court’s determining issues of credibility based on affidavits and the Court afforded him an opportunity to cross-examine Dr. Tilley with regard to the subject matter of her affidavits. He elected to do so.
6. The Deposition of Dr. Barbara Tilley
Dr. Hochberg served a subpoena duces tecum on Dr. Tilley who voluntarily produced telephone records, hotel bills, as well as volumes of materials relating to the NINDS Study. She also agreed to be deposed at her office at the Medical University of South Carolina in Charleston. The records and testimony unequivocably establish that Dr. Tilley was in California from November 14 through November 25, 2003. There is no record of any telephone call to Dr. Hochberg.[6]
A videotaped deposition of Dr. Tilley was taken on April 29, 2004. At her deposition, Dr. Tilley, who is the Chair of the Biometry and Epidemiology Department at the Medical Universiiy of South Carolina, testified that she had never spoken with Dr. Hochberg. She testified that one could not determine based on the data collected during the NINDS Study whether any participant in the Study had an active cancer. The published data reveals that fifiy-nine of the participants in the Study had been diagnosed with a malignancy. The temporal relationship between the diagnosis and inclusion in the Study, Le., whether the cancer was active, could not be determined from the collected data (published or unpublished). Dr. Tilley testified that the only way in which the temporal relationship and treatment status of the patient could be determined was by taking the patient identification number, obtaining the name of the patient and obtaining the individual patient’s original medical records from the hospital/center at which the individual patients were treated.
Lastly, Dr. Tilley testified that she is a biostatistician and regularly answers questions concerning the data that has been collected and the protocol for the Study, but she would not answer questions from physicians concerning the eligibility of specific patients to participate in the Study. She would refer persons asking such questions to the physicians involved in the Study.
7. May 19, 2004 Hearing
A hearing was held on May 19. At that hearing, Dr. Hochberg submitted the Affidavit of Mr. Gould. Mr. Gould confirmed that before the trial, he reviewed the NINDS publication with Dr. Hochberg, that Dr. Hochberg asked whether he should order the Study data and Mr. Gould said “no.” Dr. Caragher, who testified at the hearing, stated that on the day Dr. Hochberg testified at the trial, he told both of them that he had spoken with Dr. Tilley who told him that Mrs. Woj cicki would not have been included in the study. (5/19/04 Tr. at 92-94.) Dr. Hochberg also testified at the hearing that he had had a conversation with Dr. Tilley and that on the day he testified he told Mr. Gould and Dr. Caragher that Dr. *586 Tilley had told him that “no patients with cancer of an acute presenting form” had been included in the Study. (5/19/04 Tr. at 26, 76.)[7]
FINDINGS
A finding of fraud on the court must be shown by clear and convincing evidence. I find that plaintiff has shown by clear and convincing evidence that Dr. Fred Hochberg, an expert witness called by the defendant: 1) intentionally testified at the trial of this case as to the existence of a fact when he did not know whether the fact was true;[8] 2) deliberately misled the Court and the jury as to whether he had reviewed the Study data and, in particular, deliberately created the false impression in his trial testimony that he had reviewed the CD-ROM containing the actual data set and that it showed that no cancer patients were included in the Study; and 3) testified falsely at his deposition and in his February 23rd Affidavit that he had had a telephone conversation with Dr. Tilley and that she had provided the information on which his trial testimony was based.[9]
SANCTIONS
In Avelino-Wright v. Wright, 51 Mass.App.Ct. 1 (Mass.App.Ct. 2001), the Court of Appeals discussed the scope of the trial court’s inherent power to impose sanctions. The power to sanction is derived from the inherent power of a court to do what is necessary to secure the administration of justice. Id. at 4, citing New England Novelty Co. v. Sandberg, 315 Mass. 739, 746, cert. denied, 323 U.S. 740 (1944); Beit v. Probate & Family Ct. Dept., 385 Mass. 854, 859 (1982). A sanction may be imposed for conduct which obstructs and impedes the orderly course of a legal proceeding. IcL at 5, citing Clark v. Clark, 47 Mass.App.Ct. 737, 743-44 (1999). Before imposing a sanction, the Court must give the offender fair notice of the charges and a reasonable opportunity to be heard. Beit v. Probate & Family Ct. Dept., 385 Mass, at 862. “Unlike the use of the criminal contempt power, the purpose of sanctions is designed not only to punish, but also to compensate the aggrieved litigant for the actual loss incurred as a result of the misconduct of the offending party.” Avelino-Wright 51 Mass.App.Ct. at 5, citing Clark v. Clark, 47 Mass.App.Ct. at 744-45. Any monetary award should be tailored to the resources wasted or unnecessarily expended as a result of the misconduct. Id.
The fact that a new trial is necessary will require duplication of certain services provided and expenses incurred in connection with the first trial. Plaintiff is entitled to be compensated for such fees and expenses. In addition, there are strong policy reasons for awarding reasonable fees for work performed by plaintiffs attorney in connection with the post-trial proceedings. The efficacy of our judicial system depends, in the first instance, on compliance by witnesses with their oath to testify truthfully. We expect, but are not so naive as to assume, that witnesses will comply with the oath. We rely on the adversary system to expose falsity. The post-trial proceedings required the substantial expenditure of time and resources by counsel for the plaintiff, including a travel to South Carolina to attend Dr. Tilley’s deposition. The Court does not lightly make a finding that false and deceptive testimony has been given. Indeed, proof by clear and convincing evidence is required. Failure to compensate counsel who has invested substantial resources and has adduced evidence that satisfies that rigorous standard would necessarily discourage advocates from bringing to the Court’s attention and attempting to rectify the wrong that has been done to the integrity of the judicial process. Compare Desai v. Korgaonkar, 8 Mass. Law Rptr. 597, 599-600 (1998). This is particularly true where, as here, a retrial is by no means certain to result in a verdict in favor of plaintiff.
I find that the circumstances that resulted in the allowance of the motion for a new trial on February 23, 2004, warrant the imposition of sanctions against the defendant to compensate the plaintiff for certain attorneys fees and expenses incurred in connection with the first trial for the following reasons: First, the defendant did not disclose to the plaintiff that Dr. Hochberg would testify that no patient who “presented with cancer” was included in the Study. The plaintiff was therefore not prepared to counter testimony to that effect. Had plaintiff been notified, he could have anticipated the issue through testimony of his expert, Dr. Guy Rordof, and/or effectively cross-examined Dr. Hochberg by, inter alia adducing evidence that fiffy-nine of the patients who participated in the Study had at some point received a diagnosis of a malignancy from a physician and that no information as to the fype of cancer and treatment status of those patients was publicly available.
Second, at the February 23, 2004 hearing, counsel for defendant, Mr. Gould, represented to the Court that he had deliberately not asked Dr. Hochberg whether any patients included in the Study had a history of cancer and had asked the “very careful” and “very precise” question whether any patient who presented with cancer or breast cancer was included in the study. He also emphasized that Dr. Hochberg “had never testified that he reviewed the Study.”[10] To be fair to Mr. Gould, the evidence adduced at the post-trial hearings establishes that, before he testified at the trial, Dr. Hochberg falsely told Mr. Gould and Dr. Caragher that he “had talked to an investigator at NIH and ”no patients with cancer of an acute presenting form had been included" in their study (5/19/04 Tr. at 26, 76, 92-94).[11] But if, as Mr. Gould has represented to the Court (2/23/04 Tr. at 14-19), he understood that the scope of the facts to which Dr. Hochberg could truthfully testify was that, based on a telephone conversation with Dr. Tilley, it was Dr. Hochberg’s understanding that no patient like Mrs. Wojcicki with “an active cancer” or cancer “of an acute presenting form” was included in the Study, Mr. Gould had an obligation to correct Dr. Hochberg’s testimony that “zero” and “no” patients with cancer were included in the Study. Moreover, Mr. Gould knew on the day Dr. Hochberg testified that Dr. Hochberg had not reviewed *587 the data set for the Study and he had been told by Dr. Hochberg that the source of his information was a telephone conversation with an investigator for the Study. Yet he asked Dr. Hochberg whether there were any patients included in that Study who presented with cancer “based on your review of [the Study], together with your knowledge training and experience as a neurologist.” Finally, Mr. Gould did not intervene when Dr. Hochberg gave testimony that suggested that he had reviewed the CD-ROMs and, on redirect, Mr. Gould elicited testimony that could only have had the purpose and effect of contributing to the false impression created by Dr. Hochberg that he had reviewed the actual data on the CD-ROMs.[12]
I therefore order that defendant shall pay plaintiff reasonable costs, including attorneys fees, for those services provided in connection with the first trial that are wasted as a result of the necessity for a new trial. I am also ordering defendant to pay costs, including attorneys fees, incurred in connection with post-trial proceedings through Februaiy 23, 2004, when the Court allowed the motion for a new trial, as these costs were directly attributable to the fact that baseless and misleading testimony was presented to the jury.
I have found no authority directly addressing the issue whether the Court has inherent authority to impose a sanction on a non-parly witness. In the unique circumstances of this case, I find that such authority exists. At the hearing on Februaiy 23, 2004, the Court stated that it was allowing the motion for a new trial. The Court also stated that she did not find Dr. Hochberg’s deposition testimony credible and would issue a written decision on the motion for a new trial. Lastly, the Court stated that if Dr. Hochberg wished to be heard before the decision issued, he would be afforded that opportunity. Counsel for Dr. Hochberg then filed an appearance, issued subpoenas, adduced evidence, and requested further hearings, including a deposition of Dr. Tilley in Charleston, South Carolina, and an evidentiary hearing at which Dr. Hochberg testified. Counsel for the plaintiff continued to provide the balance that is essential to the proper functioning of our adversary system by attending the hearings, examining Dr. Tilley and cross-examining Dr. Hochberg, performing research and preparing memoranda.
In Avelino-Wrightv. Wright, supra, 51 Mass.App.Ct. at 5, the Court reiterated that a sanction may be imposed for conduct which obstructs and impedes the orderly course of a legal proceeding. Dr. Hochberg deliberately misled the juiy in the first trial testifying that he had knowledge about a fact that was central to the case when he had no such knowledge. He no doubt believed that a patient with Mrs. Wojcicki’s medical history would not have been included in the Study, but he testified, without basis, that, as a matter of fact, no cancer patients were included in the Study and deliberately created the false impression that his testimony to that effect was based on his review of the Study data. He compounded this error by falsely testifying that he had had a telephone conversation with Dr. Tilley. He then imposed the burden on Dr. Tilley of proving that she had not had a conversation with him and challenged the credibility of her testimony that she would not have made the statement that he attributed to her. His actions have caused plaintiff to incur attorneys fee and expenses and have wasted valuable judicial resources.
Dr. Hochberg received fair notice of the charges and a reasonable opportunity to be heard. Beit v. Probate & Family Ct. Dept, 385 Mass, at 862.
I therefore order as a sanction that Dr. Hochberg pay reasonable costs, including attorneys fees, incurred by plaintiff between February 28, 2004, when counsel for Dr. Hochberg filed an appearance through May 19, 2004, the date of the last hearing, as well as costs that will be incurred by the Office of the Jury Commissioner in connection with the retrial.
FINDINGS AND ORDER AS TO ATTORNEYS FEES AND COSTS
For the reasons stated herein, the plaintiffs motion for a new trial was allowed on Februaiy 23, 2004. Applying the factors set forth in Fontaine v. Ebtec Corp., 415 Mass. 309, 324-26 (1993), I find that the appropriate amount of attorneys fees and expenses to be paid by defendant to plaintiff is $56,000, plus expenses in the amount of $12,380.[13] I further find that the appropriate sanction to be imposed on Dr. Hochberg is payment of attorneys fees in the amount of $14,770 and expenses in the amount of $2,585. Lastly, I order that Dr. Hochberg pay $2,950 to compensate the Office of the Juiy Commissioner for the costs of providing jurors for a second trial.[14]1 further order that the payments ordered herein shall be made within thirty days of the date this Order enters unless this order has been stayed by the Appeals Court.[15]

Dr. Hochberg had never reviewed the CD-ROM. After determining that the data set for the Study could be purchased from the National Technical Information Service (see n. 6, infra], Dr. Hochberg asked Mr. Gould if he should order the CD-ROM[s], Mr. Gould said that he should not. (5/19/04 Tr. of Hochberg Testimony at 25-26; 5/19/04 Gould Aff. ¶3.) Dr. Hochberg assumed that there were two CD-ROMs. (5/19/04 Tr. at 33, 58).

Mr. Gould has not disputed that these conversations took place. The letter is in the record.

The plaintiff issued a subpoena duces tecum for production of all documents on which Dr. Hochberg’s trial testimony was based. Dr. Hochberg did not produce any documents (apart from billing records) explaining that he had destroyed his paper file shortly after he learned from Mr. Gould that a verdict had been returned. (1/23/04 Tr. at 88-90.)

The Court found that the plaintiff had met his burden of showing that the evidence relied on in support of the motion for a new trial was “newly discovered” given the failure of the defendant to disclose before trial in the expert disclosure that Dr. Hochberg would testify concerning the characteristics of patients included in the study and, in particular, that no cancer patients were included in the Study, and the fact that the data on the CD-ROM could only be read by a statistician employing specialized software. (1/10/04 Tr. at 110-12.)

The purpose for which the affidavits were offered was to establish that Dr. Hochberg’s testimony that no patients with active cancer were included in the Study was in fact true. There are several problems with the argument. First, Dr. Hochberg’s position that the unstated premise of his trial testimony was that he used the words cancer patient to refer only to a patient like Mrs. Wojcicki “who has an acute uncontrolled cancer that’s eight centimeters, that has lymph node metastasis, who has a hematocrit that is falling, who is receiving chemotherapy” finds no support in any fair reading of his testimony and ignores the fundamental fact that he had no basis on which to make such a statement. The physicians who signed the affidavits submitted by Dr. Hochberg actually participated in the Study. Yet, they signed the affidavits only after they had reviewed the original patient records and, even then, two of them qualified their statements with the language “to the best of my knowledge.” In contrast, Dr. Hochberg reviewed no data and did not qualify his testimony. He testified at his deposition that the sole basis for his testimony was a thirty-second telephone conversation with Dr. Tilley, “and nothing else.” The overwhelming evidence is that the conversation did not take place. Even if the conversation had occurred as described by Dr. Hochberg, he describes Dr. Tilley’s answer to the narrow, fact-specific question he posed as “No. To the best of her knowledge, no” and states that the conversation then ended. He asked no follow-up question to ascertain Dr. Tilley’s reason for qualifying her answer to his question and did not qualify his testimony at trial. Moreover, the basis for his testimony as to whether patients who presented with cancer were included in the Study was described at trial as his “review of [the Study] together with [his] knowledge, training and experience as a neurologist." No reference was made to the alleged telephone conversation, which is now described by Mr. Gould and Dr. Hochberg as the only basis for the testimony.

In the course of searching for documents responsive to the subpoena, the Information Technology personnel at University of South Carolina did find one e-mail from Dr. Hochberg to Dr. Tilley dated November 17, 2003, a copy of which was simultaneously sent to Dr. Marler. The e-mail was sent to Dr. Tilley six minutes after Dr. Hochberg’s telephone call to her office. In that e-mail, Dr. Hochberg identified the subject as “tPA for stroke in setting of cancer” and asked the following questions: “In the tPA (1995) NINDS study: Were active cancers excluded? Were patients on concomitant chemotherapy excluded (irrespective of counts)? Were any patients with active cancer and chemotherapy actually recipients of iv tpa [sic] or were they removed at the time of data analysis?” In the e-mail, Dr. Hochberg explained the purpose for which he was asking the questions as follows:, “I am the Neuro-Oncologist at the Mass General and the issue of tPA in cancer-related stroke has become a vexing one. ” Eric Fuller, an assistant to Dr. Marler, responded to the e-mail at 11:30 a.m. on Nov. 17 that the dataset for the NINDS trials could be obtained by clicking on a web site he provided. He also stated that if Dr. Hochberg wanted to get in touch with the investigators for the Study, he should contact Dr. Tilley and provided her e-mail address. Dr. Tilley did not answer Dr. Hochberg’s e-mail because Fuller had responded and Dr. Hochberg sent no follow-up e-mail to her. Dr. Hochberg did not produce either his e-mail or Fuller’s reply in response to the subpoena served on him by plaintiff. Cf. n.3, supra.

Dr. Hochberg argues that in the clinical setting the language he used in his trial testimony would have been understood to refer only to a patient with acute cancer. It is noteworthy, however, that in his e-mail to Drs. Marler and Tilley, he specifies that he is asking whether “active cancers” were excluded from the Study. Moreover, he asks additional questions as to whether patients “with active cancer and chemotherapy” were excluded “irrespective of [blood] counts.” Similarly, he testified at the May 19 hearing that he had told Mr. Gould that Dr. Tilley had stated that “no patients with cancer of an acute presenting form had been included in the NINDS trial” and described Mrs. Wojcicki as presenting with and having “an acute cancer.” (5/19/04 Tr. at 26, 31) (emphasis added).

In particular, Dr. Hochberg testified that no patient with cancer was included in the Study. He did not know whether that statement was true. He had made a half-hearted attempt to find out whether a patient like Mrs. Wojcicki “with active cancer” would have been included in the Study by placing phone-calls and sending an e-mail to Drs. Marler and Tilley on the first day of the trial and by asking Mr. Gould on the same day (see 5/19/04 Tr. at 52) whether he should purchase the data set, but he did not obtain an answer to the questions posed in the e-mail, much less an answer to the question whether any patients with cancer were included in the Study.

Dr. Hochberg also testified at the hearing on May 19, that it was “his memoiy and belief’ that he had spoken with Dr. Tilley and testified that Dr. Tilley was the source of the information to which he testified, a fact that was not true. (5/19/04 Tr. at 39, 42-45, 65-67.)

At the hearing, Mr. Gould stated: “At the trial of this case when I called Dr. Hochberg as a witness, I was very careful and very precise about the questions that I asked him on direct examination.” He continued: “The next questions that I asked him... were very precise and very specific ... I asked him very precisely and very specifically whether there were any breast cancer patients who presented with cancer that were part of the NINDS Study. I never asked Dr. Hochberg if there were any patients in the NINDS Study who had had a history of cancer. I never asked him that.” (2\23\04 Tr. at 14-15, 18.) He further argued: “Dr. Hochberg was never asked whether he reviewed any CD ROMs. He never testified that he reviewed any CD ROMs.” Id. at 28.

Dr. Hochberg testified at the May 19th hearing that he had told Mr. Gould and Dr. Caragher immediately before he testified that according to Dr. Tilley “no patients with cancer of an acute presenting form had been included in the NINDS trial.” 5/19/04 Tr. at 26.

These questions and answers are at pages 47-48 and 57-58 of the trial transcript for November 24, 2003, and are reprinted at pp. 4-5, supra. As to the source of Mr. Gould’s obligation to correct the testimony which was designed to and did create the false impression that Dr. Hochberg had reviewed the actual data and that it showed that no cancer patients were included in the Study, see Disciplinary Rule 3.3(4) (Candor Toward the Tribunal) and Comments [4] and [6]. Comment [6] states in part: “The lawyer’s obligation to disclose also extends to material evidence given by others on behalf of the client. Such a disclosure can result in grave consequences to the client. . . But the alternative is that the lawyer cooperate in deceiving the court, thereby subverting the truth-finding process which the adversary system is designed to implement.” See also Rule 3.07 of the Supreme Judicial Court (Massachusetts Rules of Professional Responsibility), Preamble, ¶8.

I express no opinion as to whether Dr. Caragher has the right to recover these costs and expenses from Dr. Hochberg pursuant to the contract between them. See Boyes-Bogie v. Horvitz, 14 Mass. L. Rptr. 208, 2001 WL 1771989 (Mass.Super. 2001). If such recovery is available, it would not violate this order.

According to the Office of the Jury Commissioner, the total cost of providing jurors for the first trial including postage, printing and juror compensation was $2,999.14. Payment shall be made to the “Commonwealth of Massachusetts” and mailed or delivered, along with a copy of this Order to the Administrative Office of the Trial Court, 2 Center Plaza, Boston, MA 02108.

Proof of timely payment shall be filed with this Court.